Peter R. Afrasiabi (Bar No. 193336)
pafrasiabi@onellp.com
**ONE LLP**
4000 MacArthur Boulevard
East Tower, Suite 500
Newport Beach, CA 92660
Telephone: (949) 502-2870
Facsimile: (949) 258-5081

Joanna Ardalan (Bar No. 285384)
jardalan@onellp.com
**ONE LLP**
9301 Wilshire Boulevard
Penthouse Suite
Beverly Hills, CA 90210
Telephone: (310) 437-8665
Facsimile: (310) 943-2085

*Attorneys for Plaintiff,*
Backgrid USA, Inc.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BACKGRID USA, INC., a California corporation,

Plaintiff,

v.

AUDACY, INC., a Pennsylvania corporation; and DOES 1-10, inclusive,

Defendants.

Case No.: 2:21-cv-08874

**BACKGRID'S SUPPLEMENTAL BRIEF ON JURISDICTIONAL DISCOVERY (DKT. 36)**

Pursuant to the Court's November 9, 2022 Order, Backgrid USA, Inc. submits the following supplemental brief on jurisdictional discovery:

## I. AUDACY'S CONTENTION THAT THE 'POSTING INDIVIDUALS' ARE NOT ITS EMPLOYEES IS A LEGAL CONCLUSION THAT IS UNSUPPORTED BY FACTS

Audacy Inc. ("Audacy") has represented to the Court that it has no employees and therefore cannot be responsible for the infringment at issue and could not have directed its activities to this district.[1] (Dkt. 28, ¶ 5.) It blamed separate LLCs ("Local LLCs"), which it claimed are subsidiaries of Audacy and are based outside of California. (*Id.,* ¶ 2.) Under Pennsylvania law[2], the threshold issue to determine whether an employer-employee relationship exists is the employer's right to control the employees' work. *Moore v. W.C.A.B. (Norsub, Inc.*), 111 Pa. Cmwlth. 386 (1987) ("In determining whether an employer-employee relationship exists between two parties, the key consideration is whether the alleged employer had the right to control the work to be done and the manner in which the work is performed."). The employment agreement is not dispositive but is a factor in determining whether the relationship exists. *See Hammermill Paper Co. v. Rust Engineering Co.,* 430 Pa. 365, 370 (1968) ("Control of manner work [] to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one employed is

---

[1] Determining whether Audacy has employees or not frames the issue too narrowly because, as discussed *infra*, the people who posted the infringing posts are still Audacy's agents and engaging in infringment on its behalf makes Audacy liable for the same. Assuming the Local LLCs are separate entities and posted the works, Audacy would be liable for vicarious infringment because it has the right and ability to supervise the infringment (*see* Section I, III) and has a direct financial benefit to the infringment (*see* Section I, VII) and for contributory infringment, because it has knowledge of the infringing activity [and] induce[d], cause[d], or materially contribute[d] to the infringing conduct of another." (*see* Section VII) *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004 (9th Cir. 2001).

[2] Audacy, Inc. was formed under the laws of Pennsylvania.

engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer, and also the right to terminate the employment at any time.").[3] Moreover, both Pennsylvania and California contemplate joint employment, where one employee performs work for more than one employer at the same time. *Mayen v. W.M. Bolthouse Farms, Inc.,* 1:21-cv-00318-DAD-BAK, 2022 WL 3567191 (E.D. Cal. Aug. 18, 2022); *Myers v. Garfield & Johnson Enters.,* 679 F.Supp.2d 598, 610 (E.D. Penn. 2010) ("*Myers*"). A joint employment relationship may exist even if one employer did not pay the plaintiff's salary. *Id.* ("Although Jackson Hewitt did not pay plaintiff, no single aspect of the employer/employee relationship is determinative and courts in the Third Circuit have recognized a joint employment relationship even when one employer did not pay the plaintiff's salary.")

Audacy's 30(b)(6) deponent on this topic is its Senior Counsel, Keelin Austin. Ms. Austin testified that Audacy, Inc. has no employees because she looked at the assignments of their employment agreements and based on those agreements she concluded they are not employees. (Ardalan Decl., Ex. A, 23:04-25:07.) That is not sufficient to conclude whether, or not, Audacy has employees as the critical issue is control, to which she did not provide information. She further concluded that the Posting Individuals were employees of Local LLCs because she looked at a chart that was prepared by someone else in the legal department, which represented the Posting Individuals are employees of one of the Local LLCs.[4] (*Id.,* 22:20-24:20; 27:13-23, Ex. C (the chart).) Significantly, however, Ms. Austin could not explain any factual basis for her opinion or for the chart. She

---

[3] Backgrid does not concede Pennsylvania law applies, but California law has a greater likelihood of finding an employment agreement exists. *See* Labor Code 2750.3.

[4] She does not know where the information about who purportedly uploaded the photographs came from and made no effort to verify that information (Ex. A, 30:02-31:16.)

acknowledged that she did not know whether the Posting Individuals had an employment agreement[5], she did not know in ***which state*** the people who posted the works live (Ardalan Decl., Ex. A, 60:1-11), and she did not know definitively where the information from the chart came from. *Id.,* (30:6-31:16. 32:1-34:17 [Kenny Burns]); (35:21-36:12), [Kevin Berghoff, KYKY]); (36:14-38:04) [Mike Adam]; [third row, referring to exhibit A, because Audacy is unclear who posted the information](40:21:43:20); [Hot 104.1, the information is unavailable as to who posted the photo and where that person is located (45:12-22)[6]; [Joe Cingrana] (47:3-48:12); 49:13-50:22); (51:52:04) [Kenny Burns]; (52:31-53:16) [Danni Fountain], (53:17-55:02) [Natasha Castles]. Ms. Austin's testimony was simply a regurgitation of the information produced by Audacy in a chart, without verifying the information or knowing the source of the same or having a factual basis for the information. *Id.* Ultimately, she concluded, the Posting Individuals were employed by the Local LLCs, because of her "experience" with Audacy. (*See e.g.* Austin, 53:1-10.) She did not identify any facts supporting the notion that Local LLCs had any control over Posting Individuals. And, significantly, while she testified that she knew the Posting Individuals were employees of a particular Local LLC because of the market for which they worked, she also testified that people who post content in one social media market can work for a Local LLC ***in a different market***, demonstrating that her conclusion, even if taken at face value, does not identify the employment relationship of the Posting Individuals. (*Id.*, 38:5-21) With respect to one of the posts, Ms. Austin did not know which account it was posted on,

---

[5] Ms. Austin's failure to have this information is particularly awkward considering her earlier position that she knew Audacy, Inc. has no employees because of her review of the assignment of employment agreements.

[6] Ms. Levy testified that she worked with at least two people on the list who work for "Audacy, Inc." She testified that Mr. Rouse, "manages all of the urban content for the company" and that Ms. Morris "provided best practices for social media in order to help improve their strategy as well as looked at data for each station" to local LLC, demonstrating that there is crossover between services provided by agents at various LLCs, contrary to the position taken by Audacy previously. (Ex. B, 53: 14-55:15)

demonstrating that she could not have reliable information as to who posted the work. (*Id.*, 65:12-66:20).

Ultimately, her responses never explained the critical question with respect to whether the Posting Individuals are employees of Audacy, Inc. because she never addressed who controlled the employees who posted the photos. It is clear that even assuming the Local LLCs posted the infringment, that Audacy, Inc. has control over the Posting Individuals. For example, Ms. Levy testified that it is "typical" for the Local LLCs to create social media posts which redirect people from the social media posts of the Local LLC to Audacy.com, as shown in the infringment in this action. (Ardalan Decl., Ex. B, 57:13-19; Complaint, Ex. B.) And, that Audacy, Inc. even directs which content gets posted on local social media accounts. *See* Section III.

Ms. Austin is "counsel for Audacy, Inc." but, according to her, is employed by a separate entity. (Ardalan Decl., Ex. A, 5:12-14.) All the while, she provides legal counsel to the Local LLCs that Audacy now attempts to blame for the infringment. (*Id.,* 18:7-11). While Ms. Austin represents to the world that she works for Audacy, Inc. (Ardalan Decl., Ex. D) her only factual basis for saying that she does not work for Audacy Inc. is that her paycheck says she is paid by a separate entity, which is not sufficient under *Myers* (14:03-15:13.)[7]. Further, she reports to Michael Dash, who reports to Andrew Sutor, who reports to the President and CEO of Audacy, Inc., David Field. (Ardalan Decl., Ex A, 15-16.) That relationship demonstrates that Audacy, Inc. has control over Ms. Austin's employment, notwithstanding her testimony that Audacy, Inc. has no employees. Thus, her role has counsel for Audacy, Inc., controlled by Audacy, Inc., and providing legal advice to the Local LLCs, who post content provided by Audacy,

[7] Audacy, Inc's other 30(b)(6) deponent, Mr. Levy, also represents to the world she works for Audacy, Inc. and verified that this information was accurate. (Ardalan Decl., Ex. B, 11:25-12:11; Ex. E.)

seriously undermines her unsupported testimony that the Posting Individuals are not employees of Audacy, Inc, especially without other testimony regarding employer control. (Ardalan Decl., Ex. A, 15:14-16:06.)

## II. AUDACY'S DEPONENT COULD NOT IDENTIFY WHERE THE POSTING INDIVIDUALS WERE PHYSICALLY LOCATED AND DID NOT PRODUCE RESPONSIVE INFORMATION NOTWITHSTANDING ITS AGREEMENT TO DO SO

Audacy cannot identify where each of the Posting Individuals are physically located. (Ardalan Decl., Ex. A, 60:1-11.) And, with respect to the people listed as possible Posting Individuals, listed in Exhibit A to Exhibit C of the Ardalan Declaration, Audacy could not provide information regarding where they are physically located. The conclusion that they are an employee was inferred from the station from where they worked, not by where they lived. (Ardalan Decl., Ex. A, 59:19-61:11) In other words, Audacy has provided no information that the people who posted the photographs necessarily lived within the markets covered by the Local LLC, notwithstanding the fact that Audacy stated it would produce responsive information. Ardalan Decl., Ex. G [RFP responses, 20].

## III. AUDACY, INC. DIRECTS THE LOCAL LLCS TO POST PHOTO CONTENT

At the very least, there is a factual question whether Audacy, Inc. is vicariously and contributorily responsible for the infringing acts of the stations, which would include the Local LLC stations as well as for the social media accounts purportedly based out of California. Audacy, Inc. provides content to the Local LLCs to post and even directs them to do so. It had no information whether or not the posts at issue were directed by Audacy, Inc. or not. To the extent there is a factual dispute with respect to a motion to dismiss for lack of personal jurisdiction "the court resolves all disputed facts in favor of the plaintiff." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). *See* Ardalan Decl., Ex. B, 68:17-69:01

("Do you know whether anyone on the local level who's working for social media accounts locally ever used content that was sent from Audacy, Inc., on a national level for local use? A Yes. Q Okay. How often does that happen? A I don't know. Q Does Audacy, Inc., ever provide content to post on local social media accounts? A Yes.); *Id.,* (69:13-19) "[D]oes Audacy, Inc., ever send content from -- such as photographs in (sic.) direct local social media accounts to use that content in its social media postings. A Yes."; *Id.,* (70:4-11.) "Q Okay. Do you know whether any of the photographs that were -- that appeared in Exhibit B to the complaint, whether they were sourced from Audacy, Inc.'s asset page? A No. Q No, you don't know? A I don't know.")

Audacy, Inc. also has promotions in the local areas for which social media accounts exist. "Q So Audacy, Inc., has local promotion teams in each one of the areas for which the social media accounts exist; is that correct? A Correct." *Id.* (34:6-9).

Moreover, the McConaughey photo, as shown in page 24 of Exhibit B to the Complaint (Dkt. 11-3) ("McConaughey Photo"), was posted on the Radio.com site (Radio.com was rebranded to Audacy) as an asset for other stations to use. (*Id.,* 69:20-70:03.) It is unknown which stations used that photograph, but what is known is Audacy, Inc.'s website reproduced, distributed, and displayed the photograph, not necessarily only a Local LLC. (*Id*., 66:17-67:01) and that Audacy.com solicits California residents.

## IV. AUDACY REFUSED TO PRODUCE INFORMATION ON ITS TARGETING OF CALIFORNIA RESIDENTS THROUGH PROMOTIONS, CONTESTS, MAILING LISTS, AND ADS (DKT. 36, TOPIC M)

The Court ordered discovery on Audacy's targeting of California residents through, inter alia, promotions, contests, mailing lists and advertisements. (Dkt. 36.) Audacy refused to produce documents and testimony relating to the same. *See*

Ardalan Decl., Ex. B, (70:23-71:24.); Ardalan Decl., Ex. H [Objections to notice]; Ardalan Decl., Ex. G [Objections to RFPs]. Adverse inferences can follow when a party makes a refusal to respond to Court ordered discovery. *See Baxter v. Palmigiano*, 415 U.S. 308, 317 (1976); *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 480 F. Supp. 3d 1000, 1025 (N.D. Cal. 2020). ("A defendant cannot avoid inferences by attempting to admit favorable, more limited facts, and to ignore unfavorable ones in an attempt to use the Fifth Amendment as both a shield and a sword.") As such, an adverse inference should follow.

The information sought by Backgrid is highly relevant to the personal jurisdiction question and is within the Court's order. Backgrid requested information on referral sources that directs visitors of the Social Media Accounts (i.e. the accounts that distributed the infringing posts) to other websites (Ardalan Decl., Ex. G, Request 4)[8], documents reflecting any sponsored posts on the Social Media Accounts (*Id.*, Request 5), and documents sufficient to show each contest, promotion, and/or giveaway published by Audacy (*Id.,* Request 17). Audacy refused to produce a deponent on the promotions, contests, giveaways, and/or mailing lists that were distributed through the SOCIAL MEDIA ACCOUNTS. *See* Ardalan Decl., H, Topic 8; Ex. B, (33: 12-35:06); (72:07-75:03).

Significantly, Audacy, Inc. acknowledged that it has contests that are promoted through ***different*** local markets but could not testify as to whether the local markets at issue in this litigation were cross promoted. (Ardalan Decl., Ex. B., 46:1-8).

In clear violation of the Court's order, Ms. Levy could not provide any information about a promotion that was ***within*** the Infringing Posts, including who participated in the contest. (Ardalan Decl., Ex. B, 58:08-59:02.) The Court should therefore infer that the contest successfully solicited California residents.

---

[8] Each request was limited to documents after January 1, 2018.

Moreover, Ms. Levy did not know which social media account the images posted on Page 22 and 24 of Exhibit B to the complaint were posted on (Ardalan Decl., Ex. B, 18:3-17; 18:18-22) and thus could not testify with respect to the traffic, promotions, contests, etc. that might have solicited California residents that surrounded the posts. And, she did not know if the Social Media Accounts had other posts with contests, let alone who participated in the contents (*Id.,* 63:21-64:02). She had no information on the demographics of people who enter "local contests" or "national contests" (*Id.,* 64:15-65:01). All of these factual questions must be resolved in Backgrid's favor.

## V. AUDACY REFUSED TO PRODUCE INFORMATION ON ITS TARGETING OF CALIFORNIA CLIENTS AND POTENTIAL ADVERTISERS (DKT. 36, TOPIC N)

Audacy refused to produce documents and testimony on any source of payment made in exchange for the posting of any content on the Social Media Accounts (Ardalan Decl., Ex. G, Request 6.), agreements between Audacy and any person with respect to posting content on the Social Media accounts (*Id.* Request 7), documents distributed to advertisers or potential advertisers that reflect audience reach and bears the name "AUDACY" (*Id.*, Request 10), documents reflecting any agreement executed by or on behalf of Audacy that relates to advertising, (*Id.,* Request 11) despite the Court's order.

Despite Audacy's efforts to evade this topic, Backgrid discovered that Audacy does contract with California based companies with respect to its contests and promotions. *See e.g.* Ardalan Decl., Ex. I (Stella Rosa, a California based company) and that its own website targets Southern California residents. Ardalan Decl., Ex. J. This is sufficient to support a finding that jurisdiction is proper.

## VI. AUDACY REFUSED TO PRODUCE OR DESTROYED INFORMATION ON THE WEB TRAFFIC OF EACH OF THE POSTS (DKT. 36, TOPIC L)

Audacy destroyed the traffic information that would indicate how many people visited each of the infringing posts on Instagram. (Ardalan Decl., Ex. B, 47:17-48:09). Further, Audacy could neither identify where the McConaughey Photo was posted or the web traffic associated with the photo (Ardalan Decl., Ex. B, 66:17-67:14). These factual disputes must be resolved in Backgrid's favor.

## VII. AUDACY INC.'S SMART PHONE APPLICATION IS A KEY COMPONENT OF ITS BUSINESS THAT SOLICITS CALIFORNIA RESIDENTS AND FOR WHICH IT REFUSES TO PRODUCE DOCUMENTS AND TESTIMONY

Audacy, Inc. distributes a smart phone application that gives people access to its radio stations across the country and to "follow" those stations. A key reason the Audacy branded social media accounts exist is to drive people to the application. Ms. Levy testified that "the company KPI [Key Performance Indicator] is always to drive people to listen to our app []. (Ardalan Decl., Ex. B, 26:12-22). Audacy has refused to provide documents sufficient to show the telephone number of each person with a California area code, who requested that they be texted the Audacy, Inc. phone application through the Audacy website (Ardalan Decl., Ex. G, Request 14), documents sufficient to show the name and location of each person who "followed" each of the Local LLC stations on the Audacy smartphone application and that contains California contact information (*Id.*, Request 15), and documents sufficient to show the name and location of each person who downloaded the Audacy Smartphone application and contains California contact information (*Id.,* Request 16.)

## VIII. AUDACY, INC. HAS A MAILING LIST WHICH SOLICITS CALIFORNIA RESIDENTS AND WHICH DIRECTS RESIDENTS TO STATIONS OF OTHER "LOCAL" LLCS

Audacy, Inc. solicits visitors to sign up for a mailing list. Ex. J. It refused to produce information on the people who signed up with California phone numbers,

despite the fact that it requests that information during sign up. *See* Ex. G, H, refusing to produce all promotions, contests, giveaways and/or mailing lists that were distributed through the Social Media Accounts (*Id.*, Request 8), documents sufficient to show the name and location of each person who submitted contact information to Audacy, Inc.'s newsletter that reflected a California address (*Id.*, Request 12), ; an example of each e-mail message sent to people on the Audacy mailing list since 2018 (*Id.*, Request 13), documents sufficient to show each contest, promotion, and/or giveaway published by you. (*Id.* Request 17), and each submission that contained California contact information (*Id.*, Request 18). When one signs up for the mailing list, Audacy then emails its signee with information about local stations, undermining Audacy's contention that it keeps local markets local. Ardalan Decl., Ex. L. The markets are clearly cross-promoted.

## IX. AUDACY, INC.'s CORPORATE-BRANDED SOCIAL MEDIA TARGETS LOS ANGELES AS DO THE INFRINGING POSTS

The documents produced by Audacy demonstrate that a significant portion of the Instagram followers of the infringing social media accounts are from Southern California. (Ardalan Decl., Ex. K.) The Twitter demographics were not available, and that inference must be resolved in Backgrid's favor. Moreover, Audacy, Inc. testified that the followers for its social media accounts are largely based in Los Angeles and New York. (Ardalan Decl., Ex. B, 40:13-41:06.)

## X. ADDITIONAL DISCOVERY

Backgrid contends that the information provided is sufficient to show that jurisdiction is proper. Assuming, arguendo, the Court finds that there is still a factual question about whether jurisdiction is proper, Backgrid requests additional discovery on all of the topics Audacy refused to produce information on, as shown in its objections to Backgrid's requests for production of documents. Discovery should be complete within 60 days of the Court's order.

Dated: December 30, 2022

**ONE LLP**

By: */s/ Joanna Ardalan*
Joanna Ardalan
Peter R. Afrasiabi

*Attorneys for Plaintiff,*
Backgrid USA, Inc.